PORTER-DEWITT CONSTRUCTION COMPANY, INC., *v.* DANLEY.

5-12 256 S. W. 2d 540

Opinion delivered March 16, 1953.

Rehearing denied April 27, 1953.

*Wright, Harrison, Lindsey & Upton,* for appellant.

*Bob Bailey, Jr.,* and *Bob Bailey,* for appellee.

ROBINSON, Justice. This lawsuit grows out of a head-on collision between an automobile owned and operated by appellee, Hale Danley, who was the plaintiff in the trial court, and a truck owned and driven by one Edd White. The complaint alleges that White, at the time of the collision, was acting as agent, servant, and employee of the defendant Porter-DeWitt Construction Company, Inc., a Missouri corporation authorized to do business in Arkansas. Both White and Porter-DeWitt were made defendants. There was a jury verdict in the sum of $5,500 in favor of Danley as against Porter-DeWitt, but there was a verdict in favor of White as against Danley's complaint. When the jury returned a verdict in favor of White and a verdict against White's principal, Porter-DeWitt, counsel for Porter-DeWitt moved for a judgment in favor of that company notwithstanding the verdict. This motion was overruled and Porter-DeWitt has appealed. There is only one issue to be decided: Did the trial court err in overruling Porter-DeWitt's motion for a judgment notwithstanding the verdict?

There are several allegations of negligence in the complaint. It is alleged that Porter-DeWitt was negligent by employing an incompetent driver in White; that the truck was overloaded; that the driver of the truck was required to run on a certain schedule; that the brakes on the truck were defective; that the driver of the truck was permitted to travel on the wrong side of the road; that there were improper side boards on the truck; that there were no signs warning the public of the work that was being done on the road. It was further alleged that the truck was operated by White on the wrong side of the road without keeping a proper lookout

for other persons and vehicles using the highway, and that the truck was operated at a high and dangerous rate of speed. There is no substantial evidence in the record to sustain any allegation of defendants' negligence except the allegation that White, the driver of the truck, was negligent in driving on the wrong side of the highway and in failing to keep a proper lookout for other users of the road. It is contended by appellee Danley that White, appellant's truck driver, was encouraged by appellant to drive on the wrong side of the road; and that for this reason the appellant was negligent independently of White's negligence; but the record does not sustain this claim.

We set out here in full all of the evidence that can possibly be construed as pertaining to White's driving on the wrong side of the road:

White's testimony—was hauling gravel five miles from the crusher:

"Q. Mr. White, you had been working·on this job for 3 weeks approximately. Was it customary for the operator of the truck to pass on any particular side of the road? A. We did. It wouldn't make any difference. Q. Tell the jury just how and in what manner the truck operator used that road. A. We met and passed on either side of the road. The loaded truck took the good side of the road and the empty truck took the opposite. Q. That had been customary for as long as you had been on that job? A. Yes, sir, or any other job. Q. You had had previous experience as a truck driver before you accepted this employment? A. Yes, sir."

Had approximately 6 tons on the truck.

"Q. On this morning, on June 9, 1951, did you have an accident? A. Yes, sir. Q. Do you know approximately what time that accident occurred? A. No, I don't. Q. Where did that accident occur? A. It occurred just as I entered No. 7 highway. New No. 7 highway."

"Q. As you came down the hill that morning immediately before this accident, how fast were you traveling? A. Well, I couldn't say for sure. I figure around 20 to 25 miles an hour. Q. As you approached the intersection, did you apply your brakes? A. Yes, sir. Q. And slowed down? A. Yes, sir. Q. Edd, tell the jury in your own words, from the time that you reached the intersection, what happened as you saw it, just in your own words. Just go ahead and tell them in detail what happened in this accident. A. Just before I got to the intersection of No. 7 highway, just a very short distance there that I could see, I could see a pretty good ways down the road. I seen a car coming. He darted—he was driving in the middle of the road and he darted to the left hand side of the road and I took the left hand side of the road, and when we got a shorter distance apart, he whirled right back to the left hand side of the road. Q. What position with reference to the highway did you hit? Did you hit on the left hand side? A. Yes, sir, we hit on the left hand side of the road."

"Q. Edd, was it customary for the people working on that project to give way for trucks? A. Yes, it was."

He thought the car he was meeting was that of the time-keeper.

"Q. Had the time-keeper gotten out of your way in the past? A. Yes, sir."

Cross-examination. Had worked for the defendant company about three weeks. Mr. Dark was superintendent of the job.

"Q. Did you meet Mr. Dark on the road going and coming? A. Yes, sir. Q. Did Mr. Dark give you the best part of the road? Did he go on the other side of the road? A. I passed him on the good side of the road. Yes, sir. Q. In other words, if you were going toward Russellville and you met Mr. Dark, and Mr. Dark was on the right hand side of the road, he would go on the left hand side and give you the right hand side? A. I think so."

He saw the approaching car and thought it was the time-keeper.

"Q. And you thought that the time-keeper would give you the good side of the road? A. I thought that he would give me that side. Q. That was the side that you were traveling on? A. Yes, sir. Q. And you were traveling on the left hand side of the road? A. Yes, sir. Q. Going toward Russellville? A. Yes, sir. Q. (quoting witness from a signed statement) I thought it was the time-keeper and released the brake. A. I think I did. Q. You said 'I thought it was the time-keeper and I released my brakes,' didn't you? 'He whipped it to the left side, then turned back to his side, and I hit him. I was never unconscious and turned the switch off.' Did you sign that statement? A. Yes, sir."

"Q. Did you give any signal, blow any horn? A. No, sir. Q. Did you give any signal before you got to No. 7? A. No, sir. Q. You didn't give any signal then? A. No, sir. Q. But when you thought it was the time-keeper, you released your brakes and hit him head on? A. Yes, sir."

Mr. Melville E. Dark's testimony—was superintendent of construction for Porter-DeWitt on Route 7.

"Q. Did you know that these men were traveling down the south or wrong side of the road hauling this stone when they came off of Highway 16 into No. 7? A. No, sir, I don't think that they were. Q. You don't think that they were traveling the wrong side or left side of the road? A. No, sir. Q. Although you were on the road? A. Yes, sir. Q. They were traveling on the best side of the road from there on down to Freeman Springs where you were putting the rock? A. There was no best side of the road for that long distance. Q. There was no best side? A. No, sir. That would be determined by the construction going on at that time. There were periods when dirt was being hauled or topping being shifted on perhaps the east side of the road or the west side of the road. At the times they were hauling dirt, which included rocks at times, the traffic necessarily had to take the opposite side, whether it

would be the east side or the west side. Q. Did you yourself—for instance, you were traveling north and saw a truck coming, did you give the road to the man loaded with the truck and take the other side of the road? A. I personally? Q. Yes, sir. A. I have.''

The evidence in the case and pictures that were made a part of the record show conclusively there was no good or bad side of the road at or near the point where the collision occurred; and there is no substantial evidence tending to prove that the defendant, Porter-DeWitt, advised or encouraged the drivers of the trucks to travel on the wrong side of the road at the place where the collision occurred, since there was no good or bad side of the road at that point. White testified, ''The loaded truck took the good side of the road and the empty truck took the opposite.'' It is obvious that he was referring to the point where the rock was being dumped, which was a long distance from the place of the collision. Undoubtedly at the place where the rock was being unloaded there would be a good and bad side of the road; and it was usual and customary on the job for the loaded truck to take the good side. Not only was this the practice on the job under consideration, but on other jobs, as shown by the testimony of White:

''Q. Tell the jury just how and in what manner the truck operators used that road. A. We met and passed on either side of the road. The loaded truck took the good side of the road and the empty truck took the opposite. Q. That had been customary for as long as you had been on that job? A. Yes, sir; or any other job. Q. You had had previous experience as a truck driver before you accepted this employment? A. Yes, sir.''

Mr. Dark, superintendent of construction for Porter-DeWitt, testified on cross-examination:

''Q. They were traveling on the best side of the road from there on down to Freeman Springs where you were putting the rock? A. There was no best side of the road for that long distance. Q. There was no best side? A. No, sir. That would be determined by the

construction going on at that time. There were periods when dirt was being hauled or topping being shifted on perhaps the east side of the road or the west side of the road. At the time they were hauling dirt, which included rocks at times, the traffic necessarily had to take the opposite side, whether it would be the east side or the west side.''

It is apparent that by the above statement the witness meant that when the rock or dirt was actually being placed on the east or west side of the road, the traffic would necessarily have to take the opposite side.

The effect of the jury's verdict was to say that White, the agent, was guilty of no negligence or that plaintiff Danley was guilty of contributory negligence; but that the principal Porter-DeWitt was negligent, and as to such principal, plaintiff Danley was guilty of no contributory negligence. In this situation the great weight of authority is that the verdict cannot stand.

In *Patterson* v. *Risher,* 143 Ark. 376, 221 S. W. 468, this Court quoted with approval from a California case (*Bradley* v. *Rosenthal,* 154 Calif. 420, 97 Pac. 875) as follows: ''Where a recovery is sought in an action against a principal and his agent based upon the act or omission of the agent which the principal did not direct and in which he did not participate and for which his responsibility is simply that cast upon him by law by reason of his relationship to the agent, a judgment in favor of and exonerating the agent generally *ex proprio vigore* relieves the principal of responsibility and may be availed of by the principal for that purpose.'' See, also, *Stanton* v. *Arkansas Democrat Company,* 194 Ark. 135, 106 S. W. 2d 584.

''Where the relation of the parties is such that an issue found for one defendant necessarily inures to the benefit of his co-defendant, as where a defendant's culpability is the sole predicate for his co-defendant's liability, judgment cannot be entered for the former and against the latter.'' 49 C. J. S. 84.

In a note on the subject in 78 A. L. R. 365, 15 R. C. L. 1027, is quoted: ''Where the relations between two par-

ties are analogous to that of principal and agent, or master and servant, the rule is that a judgment in favor of either, in an action brought by a third party, rendered upon a ground equally applicable to both, should be accepted as conclusive against the plaintiff's right of action against the other." See, also, *Southern Railway Company v. W. J. Harbin,* 135 Ga. 122, 68 S. E. 1103, and note thereto, 30 L. R. A., N. S. 404.

In *Chesapeake & Ohio Railway Company* v. *Williams' Administratrix,* 300 Ky. 850, 190 S. W. 2d 549, the court said: "We have noted the jury found in favor of the individual defendants, the members of the train crew. The Company's liability was based on the doctrine of *respondeat superior* and was therefore derivative, since it was based upon the charge of negligence on the part of the train crew. A finding that the servant is guilty of no negligence conclusively establishes non-liability of the master. *Louisville & N. R. Co.* v. *Farney,* 295 Ky. 8, 172 S. W. 2d 656, and cases cited therein. When the jury returned a verdict in favor of the individual defendants, the court should have set aside the verdict against the company and entered judgment in its favor."

In *Rogina* v. *Midwest Flying Service,* 325 Ill. App. 588, 60 N. E. 2d 633, the plaintiff sought to recover for the death of her intestate in an airplane crash, and there the court said: "It is our conclusion that the doctrine of *respondeat superior* arises in this case and the jury having found the defendant, Herman A. Maurer, not guilty of any negligence which was the approximate cause of Herman J. Rogina's death, then Maurer's principal, the Midwest Flying Service, Inc., cannot be legally liable for Rogina's death."

*Mississippi River Fuel Corp.* v. *Senn,* 184 Ark. 554, 43 S. W. 2d 255; *American Company of Arkansas* v. *Baker,* 187 Ark. 492, 60 S. W. 2d 572, and *Missouri Pacific Railway Company* v. *Morrison,* 186 Ark. 689, 55 S. W. 2d 933, are cited by appellee as authority for the contention that a verdict can be sustained against a principal although there was a verdict in favor of the agent

whose alleged negligence caused the injury. Those cases are distinguishable from the case at bar. *Mississippi River Fuel Corporation* v. *Senn,* and *American Company of Arkansas* v. *Baker,* are cases where an employee was suing an employer that was a corporation, and the negligence of a fellow-servant was involved. This situation called for the application of the Comparative Negligence Statute, Ark. Stat., § 81-1202. The statute is not applicable in cases such as the one here where a third party is suing an employee and his principal. The case of *Missouri Pacific Railway Company* v. *Morrison* is not applicable because in that case contributory negligence on the part of the plaintiff was a complete defense to the engineer, but would not be a complete defense for the railway company because of Ark. Stat., § 73-1004.

Appellant's motion for judgment notwithstanding the verdict should have been granted. Therefore the cause is reversed, with direction to set aside the judgment and for proceedings consistent with this opinion.

Ed. F. McFaddin, Justice (dissenting). The law is that the master may be held liable, even if the servant be released, provided the master was guilty of negligence independent of that of the servant. In the case at bar, I think the record discloses sufficient evidence of independent negligence of the master to support the jury's verdict, even with the servant released.

The complaint alleged that the Porter-DeWitt Construction Company was negligent in that it sanctioned the acts of the driver, Edd White, in driving on the wrong side of the road. That allegation related to the act of independent negligence of the master. The majority opinion, with becoming candor, quotes from Edd White's testimony, as follows:

" 'Q. What position with reference to the highway did you hit? Did you hit on the left-hand side?

" 'A. Yes, sir, we hit on the left-hand side of the road.

" 'Q. Edd, was it customary for the people working on that project to give way for trucks?

" 'A. Yes, it was.'

"He thought the car he was meeting was that of the time-keeper.

" 'Q. Had the time-keeper gotten out of your way in the past?

" 'A. Yes, sir.'

"Cross-examination. Had worked for the defendant company about three weeks. Mr. Dark was superintendent of the job.

" 'Q. Did you meet Mr. Dark on the road going and coming?

" 'A. Yes, sir.

" 'Q. Did Mr. Dark give you the best part of the road? Did he go on the other side of the road?

" 'A. I passed him on the good side of the road. Yes, sir.

" 'Q. In other words, if you were going toward Russellville and you met Mr. Dark, and Mr. Dark was on the right-hand side of the road, he would go on the left-hand side and give you the right-hand side?

" 'A. I think so.'

"He saw the approaching car and thought it was the time-keeper.

" 'Q. And you thought that the time-keeper would give you the good side of the road?

" 'A. I thought that he would give me that side.

" 'Q. That was the side that you were traveling on?

" 'A. Yes, sir.

" 'Q. And you were traveling on the left-hand side of the road?

" 'A. Yes, sir.' "

And again:

" 'Q. Tell the jury just how and in what manner the truck operators used that road.

" 'A. We met and passed on either side of the road. The loaded truck took the good side of the road and the empty truck took the opposite.

" 'Q. That had been customary for as long as you had been on that job?

" 'A. Yes, sir; . . . ' ''

In the light of the foregoing testimony, I think the act of independent negligence consisted in having Edd White drive the truck on the wrong side of the road, and therefore, there was evidence legally sufficient to support the finding of the jury that the Porter-DeWitt Construction Company was liable to Danley for such negligence.